SZALESKI ET AL. *v.* GOODMAN ET UX.

[No. 115, September Term, 1970.]

*Decided December 9, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Eugene M. Lerner* for appellants.

No brief filed on behalf of appellees.

SINGLEY, J., delivered the opinion of the Court.

In the early summer of 1968, Dan Goodman and his wife, Ada, (the Goodmans), were the owners of four adjacent waterfront lots, Nos. 10, 11, 12 and 13, on Powhatan Beach Road in Anne Arundel County. The lots were improved by three houses, one of which, situated on parts of Lots 11, 12 and 13, was occupied by the Goodmans. At a date unspecified, William P. Szaleski and his wife, Pamela, (the Szaleskis), evidenced interest in a house adjacent to the Goodmans', and in July this interest culminated in the execution of an undated "agreement of sale," prepared by Mr. Goodman.

The portion of the agreement relevant to the controversy was this:

> "This contract is for the sale of the house and lot, in fee, including garage, pier, plus one-half ownership of swimming pool and artesian well located at the bottom of the hill near the swimming pool. This property is located on the North

side of Powhatan Beach Road, 5 East of Shirley Avenue, Lot #10 and a portion of Lot #11 which has been added to Lot #10. This portion of Lot #11 shall end at the fence now in position. Total price of the above property is $17,700.00. A downpayment of $1,500.00 has been paid."

There was a provision requiring the Szaleskis to make monthly payments of $140 from which it was contemplated that there would be deducted interest at $6\frac{1}{2}\%$ on the unpaid balance of purchase price, $250 for taxes, subject to adjustment for any increase, $46 for insurance, and one-half of the taxes on the swimming pool. There followed a table of computations which projected a reduction of the unpaid balance of purchase price by $341 each year, assuming that payments were made as stipulated. The Szaleskis obligated themselves to pay the balance of purchase price within five years.

In September of 1968, the Szaleskis investigated the possibility of financing the unpaid purchase price by a borrowing secured by a mortgage and discovered that a survey would be required. In March of 1969, Mr. Goodman had a survey made which developed the perimeter of a lot having a road frontage of 74 feet and a water frontage of 72 feet. By July, Szaleski had taken the position that this was not what he had bargained for, because the water frontage should have been 89 feet, and that if he could not get what he had bought, he would "terminate the contract."

In August, the Goodmans instituted an action in equity in the Circuit Court for Anne Arundel County against the Szaleskis, alleging that the agreement was a "land installment contract" as defined by our Land Installment Contract Law (the Act), Code (1957, 1966 Repl. Vol.) Art. 21, § 110 (1); that § 111 (5) of the Act requires the recording by the vendor of a land installment contract within 15 days of execution; that the Goodman-Szaleski contract was not so recorded; that in the event of failure to

record, § 111 (5) gives "the vendee the unconditional right to cancel the contract and to receive immediate refund of all payments and deposits made * * *"; and that the Szaleskis had indicated a desire to cancel, but had not done so. The Goodmans prayed that the agreement of sale be declared null and void, and that the court determine the rights of the parties in amounts paid by the Szaleskis.

The Szaleskis answered, admitting the allegations regarding the sale and the effect of the Act but denying that they desired to cancel. After an evidentiary hearing, the court concluded that the contract was lacking in certainty and entered a decree which held the agreement to be null and void and ordered the Goodmans to pay to the Szaleskis the sum of $1,057, which was arrived at by deducting from $3,667, the amount stipulated to have been paid by the Szaleskis to the Goodmans, the sum of $2,610, or $145 per month, from 1 July 1968 to 31 December 1969, which the court found to be the fair rental value of the property.

The Szaleskis have appealed, arguing that the agreement was a land installment contract within the meaning of § 110 (1) of the Act and that since it was not recorded, they are entitled under § 111 (5) to the return of all amounts paid, without any adjustment for fair rental value. They place their principal reliance on *Spruell v. Blythe*, 215 Md. 117, 137 A. 2d 183 (1957).

The General Assembly enacted the Land Installment Contract Law by Chapter 596 of the Laws of 1951, in an effort to curb "serious actual or potential evils," *Hudson v. Maryland State Housing Co.*, 207 Md. 320, 331, 114 A. 2d 421 (1955) ; *Spruell v. Blythe, supra,* 215 Md. 117, 122. See also, Levin, *Maryland Rule on Forfeiture Under Land Installment Contracts. . .A Suggested Reform,* 9 Md.L.Rev. 99 (1948).

Judicial interpretations of the Act have been few, but we regard *Spruell,* on which the Szaleskis rely, as inapposite. In *Spruell,* there was no written contract, and no copy could be delivered to the vendee. Consequently, the

vendee could take advantage of § 111 (3), then § 119 (3), of the Act which gives a vendee the unconditional right to cancel a contract and recover all payments made under it at any time prior to the time when the vendee signs the contract and receives a copy signed by the vendor. Since it is clear that the Szaleskis and the Goodmans signed a contract, and that the Szaleskis had a copy of it, relief was not available to them under § 111 (3).

As we see it, *Maryland State Housing Co. v. Fish,* 208 Md. 331, 118 A. 2d 491 (1955) is so strikingly similar on its facts as to be clearly dispositive of the controversy before us. In *Fish,* the Housing Company had acquired title to a single tract of land in a suburban community improved by a double house, one part of which was known as No. 1925, and the other as No. 1927 Furnace Avenue. The Company sold No. 1927 to Fish under an installment contract which described the property as

> "No. 1927 Furnace Avenue, Howard County State of Maryland, Elkridge, Md. (Elkridge Landing—1st district) * * *."

Evidence in the case showed the tract to be irregular in shape, and the improvements to be located in one corner of the tract. Nowhere was the dividing line spelled out. When Fish defaulted, the Company sought to foreclose under the Act. In his answer, Fish contended that the contract was void for uncertainty and indefiniteness.

This Court, speaking through Chief Judge Brune, held that the description of the property contained in the agreement was not sufficiently definite to make the agreement valid and enforceable, relying on *Kiser v. Eberly,* 200 Md. 242, 88 A. 2d 570 (1952) and *Helmik v. Pratt,* 153 Md. 685, 139 A. 559 (1927) and then went one step further in holding that since the Act, § 110 (1), then § 118 (1), defines a "Land Installment Contract" as "a legally binding executory contract," the Act cannot be availed of by the vendor to enforce a contract void for indefiniteness, nor can the vendee under an unenforceable contract assert a right, such as a demand for the return

of all of the payments he had made, which would not have been available to him but for the Act. *Fish* is also authority for the proposition that the vendor under a void contract may be required to account to the vendee for the difference between the total amount paid by the vendee and the fair rental value of the property.

There were other problems which Mr. Szaleski shared with Mr. Fish. In *Fish*, an examination of the plat which was included in the record extract shows that an extension of the line of the party wall between the two houses would have produced a tract smaller than that which the vendor was willing to convey. In Szaleski's case, the chancellor found that the extension to the waterfront of the fence line, referred to in the contract, which ran northward from Powhatan Beach Road for only 50 feet, would have resulted in a smaller front footage than the Goodmans were willing to give the Szaleskis. In *Fish,* as is the case here, there were at least three ways in which the boundary line could be drawn, all consistent with the uncertain contract language: the way the vendor wanted it, the way the vendee wanted it, or by extending an existing line.

Judge Offutt, speaking for the Court, said in *Helmik v. Pratt, supra,* 153 Md. at 690:

> "One absolutely essential term in a contract for the sale of land, which must be shown before it can be specifically enforced, is a description of the land, either complete in itself, or which supplies data and information sufficient to enable the court with proper evidence to identify and locate the land definitely and with certainty. Upon that rule the courts are in substantial accord, but in applying it to specific cases there is no such concord."

and Judge Delaplaine, for the Court, said in *Kiser v. Eberly, supra,* 200 Md. at 248:

> "We specifically hold that land may be sufficiently described by a particular name by which

it is known in the locality in which it is located, if it distinguishes the land from all other property and the boundaries are well defined by reputation. This rule is an application of the maxim, *certum est quod certum reddi potest.* When all the circumstances of possession, ownership, situation of the parties, and of their relation to each other and to the property, as they existed at the time the negotiations took place and the instrument was executed, are disclosed, then if the meaning and application of the instrument, read in the light of those circumstances, are clear and certain, the parties will be bound by it as a sufficient contract."

Szaleski and Fish found themselves mired in the same bog of uncertainty. As vendees, they thought the property line was to be drawn in one fashion, while the vendors thought it was to be drawn in another. Szaleski's contract was of no help, since an extension of the fence line referred to in the contract would have projected a result unacceptable to either party. Unfortunately, there were no circumstances which could be relied upon to make certain what from the commencement of the transaction was shrouded in uncertainty.

> *Decree affirmed, costs to be paid by appellants.*